**United States Court of Appeals**
**Fifth Circuit**

**F I L E D**

**July 12, 2005**

**Charles R. Fulbruge III**
Clerk

IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

_____

No. 04-30395

_____

BASIN EXPLORATION INC (DELAWARE);
STONE ENERGY LLC; STONE ENERGY
CORPORATION,

                                Plaintiffs-Appellees,

        versus

TIDEWATER INC; ET AL,

                                Defendants,

TIDEWATER INC; JACKSON MARINE LLC, in personam,

                                Defendants-Appellants.

_____

Appeal from the United States District Court
for the Eastern District of Louisiana
2:01-CV-2271-S

_____

Before GARWOOD, GARZA and BENAVIDES, Circuit Judges.

PER CURIAM:[*]

---

[*]Pursuant to 5TH CIR. R. 47.5 the Court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

Tidewater Inc and Jackson Marine, L.L.C., *in personam*, and the M/V SARA TIDE, *in rem* (collectively, Tidewater) appeal the district court's judgment in favor of Basin Exploration, Inc., Stone Energy, L.L.C., and Stone Energy Corporation (collectively, Basin), for damages occasioned by an allision between a Tidewater vessel and an oil and gas well owned by Basin. Only the amount of damages awarded is challenged. We affirm.

## Facts and Proceedings Below

On July 26, 2000, the M/V SARA TIDE, a Tidewater supply vessel, struck Basin's well, well number 10 in the West Cameron Block 45 field in the Gulf of Mexico off the Louisiana coast. The allision bent the well more than 70 degrees down toward the sea floor, leaving the entire structure under water. The two outermost layers of the well casing were split open, the pipeline connections to the well were torn off, and the platform was destroyed. Tidewater does and did not contest liability, so that the sole issue between the parties is the amount of damages awarded.

Basin decided to plug and abandon (P&A) the well, which had been shut-in (out of production and closed with temporary plugs) since 1986. The year following the allision, Basin sued Tidewater in the district court below, seeking damages for the P&A costs and the cost of drilling a replacement well. Basin contended that it had planned to use the structure and casings of the No. 10 well to drill a sidetrack well from there into the field at a nearby

location.  The district court awarded Basin a total of $3,847,802 plus prejudgment interest from the date of loss.  This award included $2,079,172 in out-of-pocket costs for the P&A operation and debris cleanup, $458,630 as the extra cost of the replacement well compared to the originally planned sidetrack well, $780,000 for a replacement platform and $530,000 for replacement flow lines.

## Discussion

In general, the injured party in a tort action is entitled to be placed in as good a position financially as if the injury had not occurred.  *Gaines Towing and Transp., Inc. v. Atlantia Tanker Corp.*, 191 F.3d 633, 635 (5th Cir. 1999).  In a maritime action, recovery is limited to economically justified expenditures.  *See id.* (when the cost to repair a vessel exceeds the market value of the vessel, recovery is limited to the market value).

Tidewater argues that there were insufficient gas reserves in the field surrounding Basin's well to economically justify replacement of the well.  If drilling a replacement well was not economically justifiable, then Tidewater should not be assessed damages for it.  In addition, if further drilling in the field was not economically viable, Basin would have been obligated to permanently plug and abandon the well at some point even if there had been no allision.  Tidewater therefore argues that damages assessed should be reduced by the cost of this eventual P&A

3

operation, making Tidewater liable only for the additional P&A costs occasioned by the allision.

Even if the field was viable, Tidewater argues that the well could have been repaired at a lower cost than the combined cost of the P&A and the well replacement (minus the sidetrack costs). Therefore, according to Tidewater, Basin's recovery should be capped at the amount that the well could have been repaired for, estimated by Tidewater's expert to be $900,000.

## I.   Standard of Review

On appeal from a judgment after a bench trial, this court reviews legal issues *de novo* and findings of fact for clear error. *Houston Exploration Co. v. Halliburton Energy Servs., Inc.*, 359 F.3d 777, 779 (5th Cir. 2004).  A clearly erroneous finding is one that gives a reviewing court a "definite and firm conviction that a mistake has been committed."  *Anderson v. City of Bessemer City*, 105 S.Ct. 1504, 1511 (1985).  A factfinder's choice between two permissible views of the evidence cannot be clearly erroneous, even if the reviewing court would have decided the case differently. *Id.*

## II.  Gas Reserves

Basin presented testimony from two employees, Bruce McDonald (McDonald) and Randy Young (Young), a geologist and a petroleum engineer, on their estimate of the proved gas reserves accessible

4

from the vicinity of the destroyed well.[1]  These employees had estimated the proved reserves at 2.9 billion cubic feet (BCF), but had used a more conservative estimate, 2.3 BCF, for purposes of reporting Basin's assets as required by the Securities and Exchange Commission (SEC) and calculating projected profits from extraction of the gas.  Young testified that these profit projections ranged from $14.8 million to $4.8 million between late 2000 and mid-2001, depending on the price of gas at the time the projections were made.  Basin also presented evidence of a prior proved reserves estimate made by another Basin geologist, and a very similar estimate made by a third-party auditor.  Although these earlier analyses indicated different boundaries for the reservoir than those determined by McDonald and Young, the earlier proved reserves projection was also 2.3 BCF.

Tidewater presented testimony on estimated proved reserves from two experts, a geologist and a petroleum engineer.  The gas reservoir projected by Tidewater's experts had smaller boundaries than that arrived at by McDonald and Young, and roughly corresponded to the area common to the boundaries of McDonald and Young and those of the earlier Basin projection (*i.e.*, generally excluding any area that was not common to *all* those reserve

---

[1]Tidewater argues that these witnesses were not properly designated as experts, and that the district court erred in treating their testimony as expert testimony.  Each of these witnesses was tendered by Basin as an expert during the trial.  In response, Tidewater's counsel indicated willingness to let each witness testify on certain topics, and made few, if any, objections to the witness's subsequent testimony.

projections presented by plaintiffs). The differences in the projections apparently arose from disagreements over interpretation of data from another well in the field, the existence and extent of a particular fault in the field, and the water level in the reservoir. Tidewater's experts estimated the proved gas reserves at between 0.5 and 0.8 BCF, and projected that recovery of the reserves would result in a net loss, rather than a net profit.

The district court found Basin's testimony to be more credible,[2] and found that "it was economically feasible to attempt to produce the proved reserves." This finding was not clear error, in that there were competing permissible findings from the evidence presented. Tidewater argues that the court erred in failing to apply an adverse inference it had granted to Tidewater, where the inference involved data from a seismographic study of the gas field that Basin had not disclosed to Tidewater. It is not clear from the record that the court actually granted Tidewater's request for an adverse inference, however.[3] Adverse inferences regarding unproduced evidence are normally a result of a party's acting in bad faith. *King v. Ill. Cent. R.R.*, 337 F.3d 550, 556 (5th Cir.

---

[2]Tidewater contends that the court disregarded the testimony of its experts solely because they were paid experts. Although the court's opinion mentions that Tidewater's experts developed their opinions for the purposes of litigation, there is no indication that the opinions were completely disregarded for this reason. The court as factfinder has discretion to weigh the evidence.

[3]Although Tidewater's written motion in limine included the request for an adverse inference, the court did not explicitly act on the written motion. When the evidence came up at trial, the court orally ruled that it would "grant the motion in limine and exclude it."

2003); *Caparotta v. Entergy Corp.*, 168 F.3d 754, 756 (5th Cir. 1999). The court did not appear to find that Basin had acted in bad faith, and did not abuse its discretion in failing to so find or in failing to draw an adverse inference.[4]

Because the district court did not err in finding that production from the vicinity of Basin's well was economically justified, the court did not err in awarding damages to Basin for repair or replacement of the well.

### III. Repair vs. Replacement

The district court found that repairing the well as opposed to plugging it and drilling a replacement well would not have been economically feasible. This finding does not constitute clear error. Although the evidence of actual environmental damage was scant,[5] the severity of the structural damage to the well made concern about potential environmental liability reasonable. Although Basin's expert Jim Wilkinson conceded that the well would likely have been repaired after the accident had it been a

---

[4]The court expressed understanding of Basin's explanation that licensing restrictions with the third-party provider of the data prevented disclosure, but noted that Basin could not "have it both ways."

Furthermore, even if an adverse inference had been granted, it appears to us that there is no reasonable likelihood that applying the inference would have produced a different result. The court excluded the plaintiff's seismographic map and refused to allow the plaintiff's witness to testify on whether the seismographic map supported the witness's independently generated reserves map. There was no assertion or evidence of any particular suspect features of the seismographic map (which had been furnished to Tidewater pre-trial) that might have formed the basis of an adverse inference.

[5]All that was observed coming out of the well after the allision were small bubbles that may have been associated with a pre-existing leak.

7

producing well, he also testified to concerns with the ability of a repaired well to withstand the stresses involved in the planned sidetrack drilling operation. In addition, Tidewater's expert on this issue was unwilling to describe Basin's choice not to repair the well as unreasonable.

Because the district court did not err in finding that Basin's plugging and abandonment of the well was reasonable under the circumstances and that drilling of a replacement well was economically justifiable, the court did not err in awarding Basin its out-of-pocket costs in plugging the well and the costs of the replacement well to the extent these costs exceeded that of the originally planned sidetrack well. With respect to Tidewater's argument that the damages should be reduced by the amount Basin would have paid to plug and abandon its well in the absence of the allision, the present value of this eventual cost would be difficult to determine, given that when the well would have been plugged and at what cost are not known.[6] Furthermore, as noted by the district court, Basin's replacement well will eventually need to be plugged and abandoned at Basin's cost. This obligation takes the place of Basin's pre-allision obligation to plug and abandon the original well, so that Tidewater is not entitled to a reduction in damages.

---

[6]A Basin employee testified that a permanent P&A operation on the original well could likely have been delayed for about ten years, and that costs of P&A operations had been declining over time.

**Conclusion**

For the foregoing reasons the district court's judgment is

AFFIRMED.